**In the United States District Court
for the District of Kansas**

———————

Case No. 21-cv-02502-TC

———————

JOVAN LEDBETTER,

*Plaintiff*

v.

UNIFIED GOVERNMENT OF WYANDOTTE COUNTY /
KANSAS CITY, KANSAS,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Jovan Ledbetter filed this employment discrimination claim against the Unified Government of Wyandotte County/Kansas City, Kansas (UG), alleging a violation of 42 U.S.C. § 1981 because the Kansas City Board of Public Utilities (BPU), an administrative agency of the UG, dismissed him from the BPU Lineman Apprentice Program based on his race. The UG seeks summary judgment. For the following reasons, the UG's motion is denied.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

1

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okl.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record, *see Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga, Okl.*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

Ledbetter was dismissed from the BPU Lineman Apprentice Program in February 2019. Doc. 27 at ¶ 2.a.xvi. He argues that this result was a foregone conclusion: the Apprentice Committee set him up to fail and refused to give him adequate opportunity to learn the skills required for success because he is African American. *Id.* at 2, 5–10. The following facts are uncontroverted or, where controverted, are stated in the light most favorable to Ledbetter as the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**1.** Plaintiff Jovan Ledbetter, who is African American, has worked for Defendant UG's administrative agency, the Kansas City Board of Public Utilities (BPU), since 2011. Doc. 27 at ¶ 2.a.i, iv., vi. Ledbetter still works for the BPU as a plant helper. *Id.* at ¶ 2.a.xvii.

In January 2018, Ledbetter bid into the BPU Lineman Apprentice Program, which trains apprentices to work on power lines. Doc. 27 at ¶ 2.a.viii; Doc. 29 at ¶¶ 2–3. Ledbetter's bid was accepted, and he began the BPU Apprentice program in February 2018 as one of five apprentices in his class and the only African American. Doc. 27 at ¶ 2.a.ix.

The Apprentice Program is administered by the BPU Apprentice Committee pursuant to a collective bargaining agreement between the BPU and Ledbetter's Union. Doc. 29 at ¶¶ 3, 21. Specifically, the Apprentice Committee coordinates training experiences, oversees apprentice performance, places apprentices on performance improvement plans, and discharges apprentices. *See* Doc. 27 at ¶ 2.a.xiii-xv, Doc. 29 at ¶¶ 7, 12, 18–21, 105, 108–11, 128, 130, 133, 135–136, 158, 167–68, 171; Doc. 29-2 at 3. The Committee relies on existing BPU linemen to train the apprentices and score them on a weekly basis. *See* Doc. 29 at ¶¶ 4, 80–89.

The Program consists of several stages and lasts a total of 8,000 hours. *See* Doc. 27 at ¶ 2.a.x. Apprentices spend their first 80 hours in the "Pole Yard" learning how to climb utility poles. Doc. 29 at ¶¶ 4, 23. Apprentices then work their way up to high voltage "primary lines" in stages: first, doing deenergized work, then working with "secondary lines," and finally working with primary lines. *Id.* at ¶¶ 24–25, 27–29. As part of progressing from deenergized work to primary lines, apprentices work on a service truck with experienced linemen. *Id.* at ¶ 46. Once an apprentice completes all stages, he is said to have "topped out" and becomes a journeyman lineman. *Id.* at ¶ 6.

**2.** Ledbetter never progressed to primary lines. Doc. 29 at ¶ 28. Throughout his time as an apprentice, Ledbetter received mixed evaluations from his supervising linemen. *See id.* at ¶ 81–82, 85, 87, 89. From January to April, Ledbetter received 22 "average" marks, 6 "good" marks, and 3 "needs improvement" marks, with his best monthly marks in April.[1] Doc. 35-18. His subsequent weekly evaluations were also mixed but tended to show improvement after he was assigned to the service truck in August. Doc. 35-16.

In April 2018, Ledbetter was "called up" by the BPU Apprentice Committee for using his cell phone in the field. Doc. 29 at ¶ 7, Doc. 35-3. Although an apprentice being "called up" before the Committee is not uncommon, "call ups" are not ordinarily the first step in the disciplinary process. Doc. 29 at ¶¶ 12, 14, 18–19. One Committee

---

[1] From January through April, apprentices were evaluated monthly. *See* Doc. 35-18. They were then evaluated weekly. *See* Doc. 35 at ¶ 9; Doc. 35-16.

3

member described Ledbetter as "blindsided" by the discussion of his cell phone use. Doc. 35-3 at 2.[2]

Ledbetter was the last apprentice assigned to a service truck and it happened in August when he was put under the supervision of Matt Campion. Doc. 29 at ¶¶ 13, 33, 46, 48. Campion told Ledbetter he was behind and needed more repetitions, but that his "effort [wa]s quality." *Id.* at ¶¶ 50–52, 55. Ledbetter progressed under Campion. After four weeks on the truck, Campion noted that Ledbetter was "retaining info" and "moving in the right direction." *Id.* at ¶ 63–64; Doc. 35-16 at 7.

Ledbetter continued to receive mixed feedback. He was told that he was behind, but improving, in his subsequent evaluations. Doc. 35-16 at 11–16. In the August and September Committee meetings, the Apprentice Committee discussed "complaints" about Ledbetter and considered "send[ing] him back" to his old position or another job with the BPU. Doc. 35-6 at 2; Doc. 35-8 at 2. But on November 2 and 9, Ledbetter earned his highest marks, earning mostly "exceeds expectations" marks and some "exceptional," before scoring mostly "meets expectations" or "needs improvement" marks for the weeks ending November 16 and 21. Doc. 35-16 at 3–7.

**3.** Despite that improvement, the Apprentice Committee placed Ledbetter on a Performance Improvement Plan (PIP) on November 20, 2018. Doc. 27 at ¶ 2.a.xiii. To successfully complete the PIP, Ledbetter was required to meet several benchmarks by demonstrating certain skills to the Apprentice Committee and passing an overall practical skills test. *Id.* at ¶ 2.a.xv., Doc. 29 at ¶¶ 108–114, 130, 135. Ledbetter was able to perform all benchmarks but missed "some key safety points" and "key items." Doc. 29 at ¶¶ 137, 141, 145, 150, 154, 161.

---

[2] Considering both the minutes and the statements made by the Committee members authorized to speak about apprentice performance is permissible. *Contra* Doc. 38 at 1. The minutes are business records, Doc. 29-2 at 2; Fed. R. Evid. 803(6), and statements within those minutes were made by individual Committee members who are authorized by the BPU to speak about apprentice performance and involved in the employment decision-making process at issue. Doc. 27 at ¶ 2.a.xiii-xv, Doc. 29 at ¶¶ 7, 12, 18–21, 105, 108–11, 128, 130, 133, 135–136, 158, 167–68, 171; Fed. R. Evid. 801(d)(2)(c) & (d)(2)(d); *see Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1211–15 (10th Cir. 2022); *Frappied v. Affinity Gaming Black Hawk, LLC*, 996 F.3d 1038, 1057 (10th Cir. 2020); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010); *Fischer v. Forestwood Co.*, 525 F.3d 972 (10th Cir. 2008).

Upon failing his PIP, Ledbetter was dismissed from the Apprentice Program on February 26, 2019. Doc. 27 at ¶ 2.a. xvi; Doc. 29 at ¶ 167. Rather than terminate him entirely, the UG returned him to his prior position as a Plant Helper A. Doc. 27 at ¶ 2.a.xvii. Ledbetter's salary was less as a Plant Helper A than as a Lineman Apprentice. *See* Doc. 29-1 at 26.

**4.** Following his dismissal from the Apprentice Program, Ledbetter filed a charge with the Equal Employment Opportunity Commission. He alleged discrimination based on race and a hostile work environment. Doc. 1-1; Doc. 27 at ¶ 2.b.1. Ultimately, the EEOC issued Ledbetter a right-to-sue notice and he timely filed this case. Doc. 1-2. In this suit, Ledbetter claims that the UG violated 42 U.S.C. § 1981 by dismissing him from the Apprentice Program because he is African American.[3] Doc. 27 at ¶¶ 1.d, 4.a.i. The UG moves for summary judgment. Doc. 28.

## II

There is a genuine dispute of material fact about whether the UG dismissed Ledbetter from the BPU Lineman Apprentice Program because of his race in violation of 42 U.S.C. § 1981. As a result, the UG's motion for summary judgment is denied.

## A

Ledbetter's claim invokes 42 U.S.C. § 1981. Section 1981 mandates that "[a]ll persons within the jurisdiction of the United States [] have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981. It provides a federal remedy against race discrimination in employment. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015). A racial discrimination suit under Section 1981 applies the same legal framework as suits brought under Title VII or Section 1983. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1168 (10th Cir. 2018).

---

[3] The Pretrial Order does not include a claim for hostile work environment, nor does either party address such a claim. As a result, it has been abandoned and the only claim remaining is the Section 1981 claim. *See* Fed. R. Civ. P. 16(d).

5

Where a claim of unlawful employment discrimination is based on circumstantial evidence, district courts analyze summary judgment motions by applying the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022). First, the plaintiff must prove a prima facie case of racial discrimination. *Ford*, 45 F.4th at 1215. If a prima facie case is shown, the burden "shifts to the employer to offer a legitimate, non-discriminatory reason for its employment decision." *Id.* If the employer offers a legitimate, non-discriminatory explanation, the burden shifts back to the plaintiff to prove that the employer's explanation is pretextual. *Id.*

**1.** The elements of a prima facie case vary based on the context of the claims. In this case, Ledbetter must establish that he belongs to a protected class, suffered an adverse employment action, and that the challenged action took place under circumstances giving rise to an inference of discrimination. *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).[4]

While acknowledging Ledbetter belongs to a protected class, Doc. 27 at ¶ 2.a.v., the UG asserts that Ledbetter cannot meet the other elements of his prima facie burden, Doc. 29 at 31–35. Those arguments fail.

**a.** The Tenth Circuit defines adverse employment action "liberally and takes a case-by-case approach, examining the unique factors relevant to the situation at hand." *Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010). Actions that significantly change employment status, including "firing, failing to promote, [and] reassignment with significantly different responsibilities" are adverse employment actions. *Hillig v. Rumsfeld,* 381 F.3d 1028, 1032–33 (10th Cir. 2004) (discussing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

The evidence adduced during summary judgment establishes that Ledbetter suffered an adverse employment action when he was dismissed from the Apprentice Program. The reasons are straightforward:

---

[4] There is no obligation at the prima facie stage that Ledbetter prove he was qualified to be a lineman. *Contra* Doc. 29 at 32–33. The very nature of Ledbetter's claim is that the BPU manipulated the qualification process to preclude Ledbetter from passing the qualification test because of his race. To permit the UG to escape liability at the prima facie stage would collapse the *McDonnell Douglas* analysis in a way that would necessarily insulate a defendant from allegedly discriminatory actions. *See generally EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1192–94 (10th Cir. 2000).

the dismissal significantly changed Ledbetter's employment status by returning him to his prior position as a Plant Helper A, thereby reducing his salary, and denying him the opportunity to become a journeyman lineman. *See* Doc. 27 at ¶ 2.a.xvii, Doc. 29 at ¶ 6, Doc. 29-1 at 26.

The UG does not meaningfully argue otherwise. Instead, it argues that neither Ledbetter's "call up" to the Committee to discuss his phone use nor the order in which apprentices were assigned to work on a service truck constitutes an adverse employment action. Doc. 29 at 31. But that is a strawman—Ledbetter does not allege a Section 1981 violation for those incidents. Instead, he contends that he was dismissed from the training program because of his race. That is enough to state his prima facie case. *Cf. Kaiser v. Colo. Dep't of Corr.*, 504 F. App'x 739 (10th Cir. 2012) (suggesting that dismissal from parole officer training was an adverse employment action by holding the employer's explanation was not pretextual); *Peyton v. DiMario*, 287 F.3d 1121, 1130 (D.C. Cir. 2002) (denying new trial in Title VII case where jury found employer liable for retaliatory dismissal from an apprentice program).

**b.** "Plaintiffs can establish evidence of the third prong [of their prima facie case] in various ways, such as 'actions or remarks made by decisionmakers,' 'preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'" *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) (quoting *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005)). For preferential treatment of an employee outside the protected class to raise an inference of discrimination, the employees need to be similarly situated such that they share a supervisor or decisionmaker, follow the same standards, and engage in comparable conduct. *Ibrahim*, 994 F.3d at 1196; *see also Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007).

Construed in the light most favorable to Ledbetter, there is some evidence of differential treatment.[5] For example, there is evidence that he was singled out by the Committee because he was reprimanded for

---

[5] The white apprentices in Ledbetter's class were similarly situated because they participated in the same Program under the same decisionmaker, the Apprentice Committee, and engaged in comparable conduct, as each had to undergo roughly 8,000 hours of training. *See* Doc. 29 at ¶¶ 4–6, 12, 21, 23–27; *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).

using his cell phone in the field when white apprentices were not, despite engaging in the exact same behavior.[6]

The UG argues that the cell phone call up does not create an inference of discriminatory treatment because Ledbetter initially thought the meeting was a "pep talk." Doc. 29 at ¶¶ 9–10. While that may have been his initial view, he thought otherwise upon learning that no other apprentice had been called up to the Committee for this behavior. Doc. 29-1 at 5–6. A rational factfinder could infer discrimination because Ledbetter was singled out to discuss with the Committee how he violated the employer's policy.

Ledbetter also offers evidence that white apprentices received more training opportunities than he did. In general, the parties vigorously dispute what training Ledbetter received compared to other apprentices, and whether any of that training is material to becoming a lineman. *See, e.g.*, Doc. 38 at 10. Still, there are undisputed facts that Ledbetter received different training than his white colleagues. For example, Ledbetter was the last apprentice to be placed on the service truck. Doc. 29 at ¶ 77. And when Ledbetter was assigned to the service truck, it was just him and one lead (Matt Campion), Doc. 29 at ¶ 48, which limited Ledbetter's development, Doc. 35 at ¶ 30; Doc. 35–6 at 2.

The UG argues this evidence is unremarkable because Ledbetter's performance was materially inferior to that of the other apprentices. Doc. 29 at 35. Maybe so. But that argument improperly conflates the

---

[6] Ledbetter also asserts that the cell phone "call up" had racist undertones beyond differential treatment because Ledbetter had been led to believe that his then-supervisor, Marty Williams, wanted him out of the program. Ledbetter claims others told him that Williams had told someone else that he (Williams) wanted Ledbetter "out of the program" and that Ledbetter heard that Williams had used the "N word" in front of others. Doc. 35-2 at 23. Thus, in Ledbetter's view, Williams set him up for a Committee call up, rather than address the issue directly in the field when it occurred. Doc. 35-4 at 2–3. As the UG notes, this evidence is inadmissible hearsay that cannot be considered at the summary judgment stage. *See Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021), *cert. dismissed sub nom. Carmack v. Janny*, 142 S. Ct. 878 (2022) (requiring evidence on summary judgment to be admissible in substance); *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208–10 (10th Cir. 2010) (affirming district court's exclusion of plaintiff's affidavit statements as hearsay when the statements were based on non-party statements, not statements made directly to plaintiff); *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (same).

prima facie case with the ultimate question of whether there was intentional discrimination. At the prima facie stage, the burden is "not onerous," and the plaintiff need not respond to the employer's non-discriminatory business reason for disparate treatment. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005) (citing *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 2542–53 (1981)). The evidence offered is adequate at this stage to discharge his burden of showing a prima facie case. *See Brainerd v. Schlumberger Tech. Corp.*, 589 F. App'x 406, 410–11 (10th Cir. 2015) (holding that an employee need not address the employer's rationale of poor performance for the employee's dismissal at the prima facie stage).

**2.** After a plaintiff states a prima facie case, the employer must establish a "legitimate, non-discriminatory reason" for the adverse employment action. *Ford*, 45 F.4th at 1215. An employer's burden here is "exceedingly light." *Id.* On a motion for summary judgment, the employer need only "articulate a reason for the [action] that is not, on its face, prohibited' and that is reasonably specific and clear." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (internal quotations and citation omitted). It "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.

The UG claims Ledbetter was dismissed from the Apprentice Program because he was unable to safely perform six discrete tasks a lineman must know and therefore could not demonstrate satisfactory progress in his PIP. Doc. 29 at ¶¶ 137, 141, 145, 150, 154, 161, Doc. 29 at 35–41. This meets the UG's "exceedingly light" burden to articulate a non-discriminatory reason. *See Frappied*, 966 F.3d at 1058.

**3.** When the employer offers a legitimate non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff, who must point to evidence suggesting the employer's explanation is pretextual. *Burdine*, 450 U.S. at 256. Pretext is shown when the employer's proffered reasons are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Ford*, 45 F.4th at 1216; *see also Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011).

When examining whether an employer's explanation is pretextual, a court must consider the evidence as a whole. *Ford*, 45 F.4th at 1216. A plaintiff is not required to prove pretext by any particular method. *Bird v. W. Valley City*, 832 F.3d 1188, 1203 (10th Cir. 2016). "Evidence of pretext may include, but is not limited to, the following: prior treatment of plaintiff; the employer's policy and practice regarding minority

9

employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) (abrogated on other grounds)). "[T]iming and sequence of events leading up to [an employee's] firing are ... evidence of pretext" but are not "sufficient alone." *Bird*, 832 F.3d at 1204. On summary judgment, all doubts concerning pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

Ledbetter musters enough evidence that a reasonable jury could infer that the UG did not act for its asserted nondiscriminatory reason. A reasonable juror may infer Ledbetter was treated less favorably than similarly situated white apprentices. As discussed above, early in the program, Ledbetter was the only apprentice called up to the Committee to discuss his cell phone use in the field even though others engaged in the same or similar conduct. And, in his class of five, Ledbetter was last to receive an opportunity to train on the service truck. Then, when he finally was placed on the service truck, it was without the extra journeyman other apprentices had so he could not be properly supervised on all possible work.

It is true, as the UG suggests, that a jury may find that the explanation for these differing opportunities is innocuous or believe that the choice was made from necessity. Doc. 29 at 33. But that inference is impermissible on summary judgment since it is not the one most favorable to Ledbetter. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218–19 (10th Cir. 2013) (reversing summary judgment because an employer's explanation that its decisions were "unrelated" was not the inference most favorable to the nonmovant).

Additionally, the timing of placing Ledbetter on a PIP on the heels of his best evaluations (where he was "exceeding expectations") may suggest that the Committee had already decided to dismiss Ledbetter regardless of his performance. Even before his "exceeding expectations" evaluations in November, Ledbetter's training evaluations in August and September showed that he was making positive progress and could retain information once he was placed on the service truck. The timing of the PIP, coupled with the facts that suggest Ledbetter was treated less favorably than white apprentices, strengthens Ledbetter's showing of pretext. *See Bird*, 832 F.3d at 1204.

Moreover, Ledbetter points to statistical evidence of the "employer's policy and practice regarding minority employment" to support his claim of pretext. *See Garrett*, 305 F.3d at 1217. Statistical evidence may show pretext, so long as "the statistics […] show a significant disparity and eliminate nondiscriminatory explanations for the disparity." *Ford*, 45 F.4th at 1217 (citations omitted).[7] And here they do: the Apprentice Committee has never allowed an African American apprentice to "top out." It involuntarily dismissed the only two African American apprentices in the Program since 2015 but no others.

The UG claims a non-discriminatory explanation for terminating the only other African American apprentice. Doc. 38 at 10. In particular, it notes that the other apprentice's discrimination claim failed as a matter of law. *Id.* (citing *Garner, Jr. v. Unified Gov't of Wyandotte County/Kansas City, Kansas*, No. 21-cv-02154-EFM, 2022 WL 6099791 (D. Kan. Oct. 7, 2022)). Even so, Ledbetter's claim of pretext gathers some strength from the fact that every African American apprentice has been involuntarily dismissed.

The UG also cites *Sanders v. Southwestern Bell Telephone, LP*, for the proposition that statistics fail if they do not eliminate "nondiscriminatory explanations for the disparity such as 'individuals' job performance, experience, and training.'" Doc. 38 at 15 (quoting 544 F.3d 1101, 1110 (10th Cir. 2008) (rejecting overall workforce data surrounding an alleged discriminatory reduction in force)). The critical factor is whether the statistics are such that they "show[ ] disparate treatment between *comparable* individuals." *See Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) (emphasis in the original) (finding the plaintiff's statistics about overall plant employment did not meet the "comparable" standard). Ledbetter's statistics are sufficient because they are limited to the apprentices considered by the Apprentice Committee and, as a result, speak to whether Ledbetter's claim that the BPU Apprentice Committee deliberately sets up African American apprentices to fail by giving them inferior training.

---

[7] Ledbetter's broad statistical evidence about the racial demographics of the Wyandotte County population and of BPU Linemen are inapt. *See* Doc. 35 at 37–38. Statistics must be "closely related to the issue." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009). The same is true for the UG's invitation to examine the racial demographics of the BPU's overall lineman workforce. *See* Doc. 38-1 at 2–3; *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination.").

**B**

The UG argues that even if the BPU Apprentice Committee engaged in discriminatory practices, it cannot be held responsible for that action because the Committee did not act pursuant to an official policy or custom. Doc. 29 at 30 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). Ledbetter disagrees, arguing that this defense was not preserved in the pretrial order and, in any event, that the UG delegated authority to make hiring and firing decisions and may therefore be held responsible for those actions. Doc. 35 at 27.

**1.** A pretrial order "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d). Specifically, "'claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint.'" *Murphy-Sims v. Owners Ins. Co.*, 947 F.3d 628, 631 (10th Cir. 2020) (quoting *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002)). When deciding whether a pretrial order includes a particular claim, a court must construe the pretrial order liberally "'to cover any of the legal or factual theories that might be embraced by [its] language.'" *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979)). But the primary purpose of the pretrial order is to "avoid surprise by requiring parties to 'fully and fairly disclose their views as to … the real issues of the trial.'" *Id.* (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

Despite that obligation to disclose its views, the UG did not assert a *Monell* defense in the pretrial order or assert that it could not be held responsible for the employment decision. Instead, its defenses were limited to contesting Ledbetter's damages, mitigation, the UG's good faith, and lack of intentional conduct. Doc. 27 at ¶¶ 4.b.i–ix.

The Tenth Circuit and district courts within the circuit have frequently declined to consider claims or defenses that were not in the pretrial order. *E.g., Cortez*, 460 F.3d at 1276–77 (holding statute of limitations defense was waived); *Azim v. Tortoise Cap. Advisors, LLC*, 718 F. App'x 600, 603–04 (10th Cir. 2017) (affirming the district court's holding that the plaintiff waived his Title VII and § 1981 retaliation claims); *Elephant Butte Irr. Dist. of New Mexico v. U.S. Dep't of Interior*, 538 F.3d 1299 (10th Cir. 2008) (affirming the district court's holding that breach of contract claim was waived in the pretrial order and that "bootstrap[ping]" via a statutory interpretation theory did not preserve it); *Swearingen v. Pleasanton Unified Sch. Dist. 344*, 641 F. Supp. 3d 1141 (D. Kan. 2022) (finding theory of liability was waived), *Myrick v.*

12

*Husqvarna Pro. Prod., Inc.*, 508 F. Supp. 3d 846, 860 (D. Kan. 2020) (same). While it does not appear that the Tenth Circuit has ever considered the effect of an absent *Monell* defense in a pretrial order, the Eleventh Circuit has. *Morro v. City of Birmingham* affirmed the district court's refusal to consider an unpreserved *Monell* defense even though there was little doubt that, had it been preserved, the municipality would have escaped liability. 117 F.3d 508, 515 (11th Cir. 1997). That conclusion is consistent with binding Tenth Circuit precedent. *See Murphy-Sims*, 947 F.3d at 630. As a result, the UG may not now avail itself of a defense it did not preserve. *See id.*; Fed. R. Civ. P. 16(d).

The UG states, without any legal authority, that it need not preserve such a claim in the pretrial order because "it is a legal requirement for Plaintiff to state a claim, setting forth an essential element Plaintiff must establish to state a claim for discrimination against Defendant." Doc. 38 at 7. That position ignores the purpose of pretrial orders generally and controlling precedent specifically. The purpose of a pretrial order and Rule 16 is to "fully and fairly disclose […] the real issues of the trial" to "replace the old sporting theory of justice with a policy of putting the cards on the table." *Cortez*, 460 F.3d at 1276–77 (internal citations and quotations omitted). The UG points to no prior statement that it ever asserted it was not responsible for the employment decision delegated to its BPU Apprentice Committee. As a result, it may not do so now. *Cf. Simmons v. Uintah Health Care Special Dist.,* 506 F.3d 1281, 1284–86 (10th Cir. 2007) (reversing the district court's judgment that a municipality was immune under *Monell* where the municipality failed to dispute that a decisionmaker was a final policymaker).

**2.** Even if the UG had not waived its *Monell* defense, it would fail on the merits of the current summary judgment record. The evidence submitted suggests that the BPU Apprentice Committee is a final policymaker regarding apprentices and its termination of Ledbetter qualifies as a final policy.

Generally, a municipality is not liable for its employees' acts by way of respondeat superior under 42 U.S.C. § 1981. *Randle v. City of Aurora*, 69 F.3d 441, 447–50 (10th Cir. 1995) (limiting liability under § 1981); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (same under § 1983). But there are several ways in which a municipality may bear responsibility for its own actions through its custom or policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). These include an express policy that causes a deprivation, *see Monell*, 436 U.S. at 694, a custom or persistent practice with the force or effect of policy, *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411–12 (1997); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989), a single decision by

13

an official with final policymaking power or by an employee in conformance with preexisting official policies or customs, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–24 (1988); *Pembaur*, 475 U.S. at 480–81; *Simmons*, 506 F.3d at 1285, or ratification, by a final policymaker, of a decision—and basis for the decision—of a subordinate with delegated authority, *see Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).

This is a case where the municipality delegated its final policymaking power to a sub-agency. Municipalities cannot create elaborate schemes to insulate themselves from liability. *See Praprotnik*, 485 U.S. at 127; *see also Randle*, 69 F.3d at 447–49. Thus, a municipality can be liable where policymaking power has been delegated and the final delegee's acts are not constrained by "meaningful—as opposed to merely hypothetical" review. *Randle*, 69 F.3d at 448–49.

The UG asserts that it cannot be liable for the Apprentice Committee's acts for two reasons. First, the UG's Charter specifies that the UG's delegation of authority stops at the BPU and its General Manager. And second, because the UG has not adopted an official custom within the meaning of *Monell*, relying on *Mitchell v. City and County of Denver*. Doc. 29 at 30–31; Doc. 38 at 7–8. Both arguments fail.

The UG's invocation of Charter Ordinance No. CO-5-01 undermines the UG's argument because the BPU and its General Manager delegated their final authority over apprentice firing to the Apprentice Committee. Doc. 29 at 30–31; Doc. 38 at n.1. The facts show that the Apprentice Committee has authority to coordinate training experiences, oversee apprentice performance, place an apprentice on a PIP, and discharge an apprentice. *See* Doc. 27 at ¶ 2.a.xiii, Doc. 29 at ¶¶ 105, 108–11, 128, 130, 133, 135–136, 158, 167-68, 171; Doc. 29-2 at 3. Specifically, the UG stipulates that the Apprentice Committee had authority to place Ledbetter on the PIP and dismiss him from the Lineman Apprentice Program. Doc 27 at ¶¶ 2.a.xiii., xvi. And the UG offers no facts to suggest that the Apprentice Committee's decisions were subject to meaningful review by the BPU, its General Manager, or the UG. *See* Doc. 29 at ¶¶ 3, 21; Doc. 27 at ¶ 2.a.xiii. On these facts, the Apprentice Committee was the UG's final policymaker when it came to termination and promotion decisions for apprentices. *See Randle*, 69 F.3d at 448–49.

The UG's analogy to *Mitchell v. City and County of Denver*, 112 F. App'x 662 (10th Cir. 2004) is unpersuasive. The UG relies on *Mitchell* to assert that it cannot be liable because Ledbetter cannot prove the UG has a "custom" such that discriminatory employment practices are

14

"widespread" and "standard operating procedure." Doc. 29 at 30. *Mitchell* is distinguishable: it involved a plaintiff attempting to impose liability on a municipality because a low-level supervisor without final policymaking power used racist epithets. As a result, the plaintiff attempted to prove this was a municipal custom. *See* 112 F. App'x at 671–73. That is not what is at issue in this case. The evidence in the record establishes that the Apprentice Committee received final policymaking power from the UG when it comes to firing and promoting BPU lineman apprentices, so no proof of "widespread" custom or policy is required. *See Randle,* 69 F.3d at 447–450 (recognizing separate analysis for custom versus policymaker liability).

### III

For the foregoing reasons, Defendant's Motion for Summary Judgment, Doc. 28, is DENIED.

It is so ordered.

Date: September 27, 2023            s/ Toby Crouse
                                    Toby Crouse
                                    United States District Judge